**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JOHN E. HEDRICK,**

     **Plaintiff,**

**v.**                                                   **Case No.: 3:14-cv-23775**


**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

     **Defendant.**


## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 12).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the presiding District Judge **DENY** Plaintiff's motion for judgment on the pleadings, (ECF

No. 11); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 12); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

## I.    Procedural History

John E. Hedrick ("Claimant") filed an application for SSI on October 7, 2010, alleging a disability onset date of December 31, 2003, (Tr. at 172), due to "knee problems, leg problems, cannot read, cannot write." (Tr. at 220). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 90). Consequently, Claimant filed a request for an administrative hearing, which was held on June 27, 2012 before the Honorable Maria Hodges, Administrative Law Judge ("ALJ"). (Tr. at 453-75). In light of some documentation supplied by Claimant after the administrative hearing, the ALJ conducted a supplemental hearing on April 24, 2013. (Tr. at 476-89). By written decision dated May 29, 2013, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 87-99). Claimant filed a request for review with the Appeals Council. The ALJ's decision became the final decision of the Commissioner on May 20, 2014 when the Appeals Council denied Claimant's request for review. (Tr. at 5-9).

Claimant timely filed the present civil action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10). Plaintiff filed a Brief in Support of the Pleadings, Defendant filed a Brief in Support of Defendant's Decision, and Plaintiff replied. (ECF Nos. 11, 12, 13). Therefore, the matter is fully briefed and ready for resolution.

## II.   **Claimant's Background**

Claimant was 43 years old at the time of his initial application and 47 years old at the time of the ALJ's decision. (Tr. at 457). He completed the 11th grade, allegedly assigned to special education courses, and has not obtained a General Equivalency Diploma ("GED"). (Tr. at 221, 303). Claimant communicates in English, but is not able to read or write well. (Tr. at 219) Claimant's past relevant work includes employment as a laborer. (Tr. at 221).

## III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not engaged in substantial gainful employment, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If so, then the

claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, under the fourth step the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the ALJ must ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ

4

rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 416.920a(d). A rating of "none" or "mild" in the first three functional areas (limitations on activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. 20 C.F.R. § 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* § 416.920a(e)(4).

In this case, the ALJ confirmed at the first step of the sequential evaluation that Claimant had not engaged in substantial gainful activity since July 1, 2010, the application date. (Tr. at 92, Finding No. 1). At the second step of the evaluation, the ALJ

determined that Claimant had the following severe impairments: "polysubstance abuse, borderline intellectual functioning, and status-post right ankle and left knee fractures." (Tr. at 92, Finding No. 2). Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 92-94, Finding No. 3). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he should only occasionally climb, balance, stoop, crouch, kneel, or crawl but never climb ladders, ropes, or scaffolds. He should avoid concentrated temperature extremes, vibrations, and hazards. Work is limited to one-to-two step tasks in a low stress environment (defined as only occasional decision-making required and only occasional changes in work setting, with no production rates). He should have no interaction with the public and he should have only occasional interaction with co-workers and supervisors.

(Tr. at 94-98, Finding No. 4). At the fourth step, the ALJ determined that Claimant was unable to perform his past relevant work. (Tr. at 98, Finding, No. 5).  Under the fifth and final inquiry, the ALJ reviewed Claimant's past work-related experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 98-99, Finding Nos. 6-9). The ALJ considered that (1) Claimant was born in 1966, and was thus defined as a younger individual; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the determination because the Medical-Vocational Rules supported a finding of "not disabled" regardless of Claimant's transferable skills. (Tr. at 98, Finding Nos. 6-8). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, including work as a light level laundry worker and product inspector or, at the sedentary level, as a machine monitor

and grader/sorter/selector. (Tr. at 98-99, Finding No. 9). Therefore, the ALJ concluded that Claimant had not been under a disability, as defined in the Social Security Act, since July 17, 2010. (Tr. at 99, Finding No. 10).

## IV. **Claimant's Challenges**

Claimant raises three challenges to the Commissioner's decision. First, he argues that the ALJ failed to comply with Social Security Ruling ("SSR") 96-6p by ignoring the opinions of consulting psychologists. (ECF No. 11 at 9-10). Specifically, Claimant contends that the ALJ did not evaluate or weigh the Psychiatric Review Technique and Mental Residual Functional Capacity Assessment prepared by James Capage, Ph.D., a non-examining agency consultant, or an affirmation of Dr. Capage's opinions by a second agency consultant, Bob Marinelli, Ed.D. Second, Claimant complains that the ALJ erred by accepting incomplete testimony from the vocational expert. (*Id.* at 10-11). Claimant notes that the vocational expert failed to provide occupation codes from the Dictionary of Occupational Titles ("DOT") when opining that Claimant could perform certain jobs available in the national economy. According to Claimant, the absence of DOT codes precluded the ALJ from fulfilling his duty to insure that the vocational expert's testimony did not conflict with the DOT. Moreover, without DOT codes, which allow the particular requirements of a listed occupation to be analyzed, the ALJ could not corroborate that the jobs listed by the vocational expert could actually be performed by Claimant. Lastly, Claimant asserts that the ALJ violated the mandates of SSR 96-7p in the credibility analysis. (*Id.* at 11-13). In Claimant's view, the ALJ failed to consider all seven factors set forth in SSR 96-7p and, thus, failed to perform a valid credibility assessment. Claimant contends that these errors are prejudicial and require reversal and remand of the Commissioner's decision.

In response, the Commissioner argues that reversal and remand are inappropriate in this case because Claimant has failed to demonstrate how any of the alleged errors resulted in prejudice. The Commissioner concedes that while the ALJ did not expressly weigh the opinions of Dr. Capage and Dr. Marinelli, she clearly considered the opinions and incorporated Dr. Capage's proposed limitations in the RFC finding. (ECF No. 12 at 14-16). With respect to the vocational expert's testimony, the Commissioner points out that the ALJ inquired regarding the consistency of the vocational expert's testimony with the DOT. Once the vocational expert confirmed that they were consistent, the ALJ met his obligations and did not need specific occupation codes. (Id. at 16-18). Finally, the Commissioner argues that the credibility analysis performed by the ALJ fully complied with the regulations and rulings. Furthermore, the Commissioner reminds the Court that credibility determinations rest with the ALJ and should not be disturbed by a reviewing court unless they are "unreasonable, contradicts other findings of fact, or [are] based on an inadequate reason or no reason at all." (Id. at 18) (quoting *Edelco v. NLRB,* 132 F.3d 1007, 1011 (4th Cir. 1997)).

## V.   <u>Relevant Medical History</u>

The undersigned has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The following is a summary of Claimant's medical information.

### A.  Treatment Records

Claimant supplied assorted medical records documenting a left knee laceration, (Tr. at 426), knee surgery, (Tr. at 71), a right foot injury, (Tr. at 391), an appendectomy, (Tr. at 432), and right ankle fracture. (Tr. at 438). Claimant also provided an Emergency Department record from November 2010, which recorded a back strain Claimant

suffered when lifting his heavy neighbor. (Tr. at 13-14, 19). This record reflects that Claimant had no significant medical history, a normal range of motion and strength, a negative straight-leg raising test, and an absence of neurological deficits. (Tr. at 15-16, 21).

### B. Disability-Related Evaluations

On December 21, 2007, Claimant was examined and evaluated by David E. Frederick, Ph.D., of Argus Psychological Services, for the West Virginia Disability Determination Services ("DDS"). (Tr. at 302-05). Dr. Frederick documented his general observations of Claimant, indicating that Claimant drove alone to the evaluation, produced a driver's license, and did not wear corrective lenses. Claimant was cooperative during the evaluation and his attitude was serious. Claimant reported that he had problems with his left knee, right ankle, left eye vision, right foot, headaches, and with reading and writing. He stated that his illiteracy had been a lifelong problem. Claimant had no history of mental health treatment, but had undergone eight surgeries in the past, including procedures related to broken bones, lacerations, and gallbladder disease. He currently took no medications and described his health status as "fair." (Tr. at 302-03).

When asked about his substance usage, Claimant admitted to drinking six beers three or four times per week. He had one DUI approximately twelve years earlier. Claimant stated that he drank his last beer two days prior to the evaluation. (Tr. at 303). Regarding his educational background, Claimant indicated that he dropped out of school in the twelfth grade because his grades were bad, and he wanted to work at his dad's junkyard rather than attend school. Claimant alleged that he was in special education classes, although the records from Cabell County Schools do not expressly

corroborate that allegation.[1] Claimant speculated that he was promoted in school largely due to his athletic achievements. Lastly, Claimant provided his employment background, stating that he had worked at 15 laborer positions, with his last job being in construction. (*Id.*).

Dr. Frederick performed a mental status examination. He found Claimant to be oriented to person, place, and date; he had normal thought content, speech, and perception. His insight was noted to be "fair." Claimant explained that the cause of recent his problems was conflict with employers "over his need to care for his unhealthy parents." (*Id.*). Claimant's attitude and behavior was described as "well-motivated," and his mood was euthymic. Claimant's immediate and remote memory was normal, but his recent memory was evaluated as severely deficient. (Tr. at 305). His concentration was mildly deficient. Claimant's persistence and pace were normal, as was his social functioning. He described his activities of daily living as getting up daily at 5:30 a.m. to take his wife to work by 7:00 a.m. After dropping his wife off at work, he went to his diabetic mother's house to make her coffee and then took his children to school. After dropping them off, he would return to his mother's house and make her breakfast. (*Id.*). Claimant generally spent the day trying to figure out how to make money. He indicated that he could cook, and do laundry and housekeeping. He spent his evenings with his family, watching television and trying to help his children with their homework. He usually ate around bedtime, and reported some mid-phase insomnia.

Dr. Frederick administered a Wechsler Adult Intelligence Scale and a Wide Ride Achievement Test. (Tr. at 304). Claimant's verbal IQ was 69; his performance IQ was

---

[1] Claimant's school records do not document that he was placed in special education courses, although Claimant's grades and other testing results demonstrate that he was performing at low to very low levels when compared to other students locally and across the United States. (Tr. at 198-214).

76: and his full scale IQ was 70. Dr. Frederick interpreted these scores as valid given that Claimant was persistent and focused on all tests, and they were consistent with Claimant's background and the results of his Achievement Test. According to the Achievement Test, Claimant was reading at a third grade level, spelling at a second grade level, and performing arithmetic at a seventh grade level. (*Id.*). Dr. Frederick concluded that Claimant's IQ was in the mildly mentally retarded level, although that was a provisional diagnosis in view of the absence of any pre-adulthood IQ data. Claimant had no other psychiatric diagnoses. (Tr. at 305).

On December 28, 2007, Claimant underwent a physical examination and assessment by Dr. Drew Apgar at the request of DDS. (Tr. at 306-18). Dr. Apgar found that Claimant was in good shape physically and should have no difficulty with "standing, walking, sitting, lifting, carrying, pushing, pulling, handling objects with the dominant hand, hearing, speaking, traveling." (Tr. at 317). Dr. Apgar assessed Claimant's understanding, memory, concentration, interaction, and adaption to be normal. He noted that Claimant denied having depression and his mental status "was essentially normal despite lack of education and past medical history." Dr. Apgar acknowledged Claimant's report of illiteracy, but indicated that he could not verify it. (Tr. at 318).

On October 18, 2010, Claimant was evaluated by Lisa Tate, a Masters-level psychologist. (Tr. at 326-30). Claimant reported his chief complaints to be illiteracy and "health problems." (Tr. at 327). He stated that could not read or write well enough to complete a job application, and his wife handled all of the finances. Ms. Tate reviewed the IQ testing performed by Dr. Frederick in 2007, noting that Dr. Frederick had filed an addendum to his report in which he opined that Claimant had borderline intellectual functioning rather than mild mental retardation. (Tr. at 301). Ms. Tate documented

11

Claimant's reported history of special education, his dropping out of school in the twelfth grade, and his failure to obtain a GED. (Tr. at 328).

With regard to Claimant's medical history, he complained of pain in the joints, left knee problems related to a previous injury, and right leg problems arising from a hip injury and surgery. However, he took no prescription medications and reported no recent illnesses, injuries, or hospitalizations. (Tr. at 327). Claimant admitted to consuming a pint of whiskey every day, but denied any alcohol-related issues. He advised Ms. Tate that he had been drinking regularly for the past ten years, and upon awakening that morning, he had made a mixed drink consisting of 50% alcohol and 50% Pepsi. Claimant also admitted to marijuana usage, stating that he smoked marijuana one or two times per week. However, he denied any drug-related issues, and also denied receiving treatment for drug or alcohol abuse. (Tr. at 328).

Ms. Tate recorded Claimant's employment history as including jobs as a general laborer, as a wrecker service mechanic, as a deck hand, and a construction worker. He had been fired from two jobs; one time, for fighting with a co-worker, and the second time, for making a mistake on the job. When asked about his developmental and social history, Claimant stated that he had no problems during his childhood. He had been married twice and had three children, including twin fourteen-year-old daughters from his second marriage. He described his relationship with his wife as "pretty good." (*Id.*).

Claimant's mental status examination reflected that he was alert and oriented, with a broad and reactive affect and euthymic mood. Claimant's thought processes appeared logical and coherent, with normal content, judgment, and perceptions. His insight was fair; his immediate and remote memory was normal, but his recent memory and concentration were assessed as moderately deficient. (Tr. at 329). Ms. Tate

12

documented Claimant's daily activities as talking and playing cards with his neighbors; tinkering around the house; occasionally watching sporting events; watching television; and going to a local convenience store. He showered or bathed every other day; played cards on the weekends; helped his wife cook three to four times per week; washed dishes three or four times per week; mopped the kitchen twice per week; and went to the liquor store three times per week. Twice per year, Claimant washed the siding on his house, and he mowed and weed-eated the lawn every two weeks in the summer. Claimant also had a friend in Chesapeake, Ohio that he visited regularly. Ms. Tate concluded that Claimant's social functioning was normal, as were his persistence and pace. Nonetheless, Claimant's concentration was moderately deficient, and Ms. Tate expressed concern that Claimant's alcohol dependence would make him incompetent to manage benefits. (Tr. at 330).

November 10, 2010, Claimant presented to Dr. Kip Beard for an updated physical evaluation at the request of the DDS. (Tr. at 331-35). Dr. Beard summarized his findings, indicating that Claimant had some osteoporosis in his left knee and ankle, with mild motion abnormalities. Claimant also had visual acuity of 20/200 in both eyes, which was likely the result of uncorrected myopia. (r. at 335).

James Capage, Ph.D., completed a Psychiatric Review Technique and Mental Residual Functional Capacity ("MRFC") Assessment on December 8, 2010. (Tr. at 344-61). Dr. Capage diagnosed Claimant with an organic mental disorder (borderline intellectual functioning), alcohol dependence, and cannabis abuse, provisional. (Tr. at 344-45, 352). With respect to paragraph B criteria, Dr. Capage found Claimant to have mild impairment in activities of daily living; moderate impairment in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation of

13

extended duration. (Tr. at 354). There was no evidence of paragraph C criteria.

In the more detailed MRFC Assessment, Dr. Capage opined that Claimant was markedly limited in his ability to understand, remember, and carry out detailed instructions; was moderately limited in his ability to maintain attention and concentration for extended periods and work near or in coordination with others without being distracted; was moderately limited in his ability to complete a work day without interruptions from psychologically based symptoms and to perform at a reasonable pace without an unreasonable number of breaks; was moderately limited in his ability to accept criticism or direction from supervisors and to work well with others; and was moderately limited in his ability to accept change in the work place, set realistic goals, and make plans independently. (Tr. at 358-59). Dr. Capage summarized his thoughts by stating that Claimant did not meet a listing, although his symptoms were severe. Dr. Capage felt that Claimant retained the capacity to understand and carry out 1-2 step instructions and perform simple, unskilled repetitive work in a low-demand setting that only required occasional and superficial contact with others. (Tr. at 360). Dr. Capage's opinions were affirmed by Bob Marinelli, Ed.D. on May 16, 2011. (Tr. at 367).

On August 2, 2012, Dr. Steven Gitlow, a psychiatrist certified in addiction treatment, reviewed Claimant's case file and completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) form, answered special interrogatories, and provided a written analysis to the ALJ. (Tr. at 443-52). Dr. Gitlow opined that Claimant had moderate impairment in his ability to understand, remember, and carry out complex instructions and make complex work-related decisions. (Tr. at 443). He did not believe Claimant had limitations in his ability to interact appropriately with

supervisors and co-workers, but felt that Claimant would have mild difficulty responding appropriately to changes in the routine work setting. (Tr. at 444). He did not believe Claimant was capable of managing his benefits. (Tr. at 445).  Dr. Gitlow conceded that he had not examined Claimant, but stated that there was sufficient information in the file upon which to form opinions regarding the nature and severity of Claimant's psychological impairments. (Tr. at 446). When asked about paragraph B criteria, Dr. Gitlow opined that Claimant had no limitations in activities of daily living and social functioning, but was moderately impaired in his ability to maintain concentration, persistence, or pace. (Tr. at 447). Dr. Gitlow did not believe Claimant met any listed impairment. (Tr. at 448). He explained that Claimant had a longstanding and ongoing use of marijuana and alcohol, both of which had a direct impact on his cognitive functioning. For that reason, Claimant's psychological functioning in the absence of alcohol or drugs could not be readily determined. Nevertheless, Dr. Gitlow opined that Claimant's IQ was in the borderline range, pointing out that Claimant's history did not establish the presence of severe intellectual deficits causing severe limitations. (Tr. at 451). To the contrary, Dr. Gitlow felt Claimant's history corroborated that his intellectual deficits had not imposed severe limitations. Dr. Gitlow opined that Claimant's continued use of alcohol and marijuana increased the likelihood of significant damage in the future, but Claimant currently did not have that level of impairment. (*Id.*).

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v.*

*Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

**VII.   <u>Analysis</u>**

Having thoroughly considered the evidence and the arguments of counsel, the undersigned rejects all three of Claimant's challenges as more fully explained below. Additionally, the undersigned **FINDS** that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

### A.  ALJ's Consideration of Dr. Capage's Opinion

Claimant argues that the ALJ failed to comply with Social Security Ruling 96-6p by ignoring both the opinion of Dr. Capage and the affirmation of that opinion by Dr. Marinelli. (ECF No. 11 at 9-10). According to Claimant, the ALJ was obligated to consider and weigh all of the medical source statements; thus, her disregard of Dr. Capage's opinion, which found Claimant to be markedly impaired in two work-related

16

functions and moderately impaired in seven other functions, requires remand.

In determining whether a claimant is disabled, the ALJ should consider all of the medical opinions in the record together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b). Title 20 C.F.R. § 416.927(c) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for benefits. In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *See* 20 C.F.R. § 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 416.927(c)(2). In the case of a nonexamining agency consultant, the ALJ must consider the consultant's "findings of fact about the nature and severity of an individual's impairments as opinions of nonexamining physicians and psychologists." SSR 96-6p, 1996 WL 374180, at *2; *see also* 20 C.F.R. § 416.927(e)(2). In doing so, the ALJ will:

> evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions. Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant ... as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.

20 C.F.R. § 416.927(e)(2)(ii). In determining the supportability of an agency consultant's findings, the ALJ must consider the record as a whole and, among other things, assess the consistency of the findings with the other evidence. *Id.* ("[T]he opinions of State agency medical and psychological consultants and other program

physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record."). While the ALJ is not bound by the agency consultant's findings, the ALJ must bear in mind that agency medical consultants are "highly qualified physicians, psychologists, and other qualified medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. § 416.927(e)(2)(i). Consequently, the ALJ "may not ignore these opinions and must explain the weight given to the opinions" in the written decision. SSR 96-6p, 1996 WL 374180 at *2.

Here, the ALJ did not explicitly assign weight to Dr. Capage's opinion, or to the affirmation by Dr. Marinelli. However, the ALJ plainly considered the opinions, gave them significant weight, and adopted Dr. Capage's conclusions in Claimant's RFC finding. (Tr. at 94-96). In rating Claimant's functional limitations, Dr. Capage found Claimant to be moderately limited in social functioning and concentration, persistence, or pace; mildly limited in activities of daily living; with no evidence of decompensation. (Tr. at 354). After rating the severity of Claimant's limitations with respect to certain work-related functions, Dr. Capage concluded that Claimant retained the mental capacity to "remember and carry out 1-2 step instructions. He can perform simple unskilled repetitive work-related activities in a low-demand setting that does not require more than occasional and superficial social interaction." (Tr. at 360). In her written opinion, the ALJ specifically referenced Dr. Capage's conclusion, stating:

> The State Agency psychological medical consultant opined the claimant retains an ability to perform one-to-two step repetitive work in low demand settings with no more than occasional social interaction, with mild limitations in activities of daily living, moderate limitations in social functioning and concentration, persistence, or pace, and no evidence of decompensation.

(Tr. at 97). The ALJ then incorporated Dr. Capage's conclusion in the RFC finding by

limiting Claimant to work requiring only "one-to-two steps in a low stress environment," defined as "only occasional decision-making ... and only occasional changes in the work setting, with no production rates," and by restricting his social interaction to "only occasional." (Tr. at 94).

Courts have routinely applied a harmless error analysis to administrative decisions that do not fully comport with the procedural requirements of the agency's regulations, but for which remand "would be merely a waste of time and money." *See, e.g., Jenkins v. Astrue,* 2009 WL 1010870 at *4 (D.Kan. Apr. 14, 2009) (citing *Kerner v. Celebrezze,* 340 F.2d 736, 740 (2d Cir. 1965)). The Fourth Circuit has applied a similar analysis in the context of Social Security disability determinations. *See Morgan v. Barnhart,* 142 F.App'x 716, 722–23 (4th Cir.2005) (unpublished); *Bishop v. Barnhart,* 78 F.App'x 265, 268 (4th Cir.2003) (unpublished). In general, remand of a procedurally deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission,* 721 F.2d 1054, 1056 (6th Cir.1983); *Burch v. Astrue,* No. 5:10-cv-031-RLV-DCK, 2011 WL 4025450, at *6 (W.D.N.C July 5, 2011) (*citing Camp v. Massanari,* 22 F.App'x 311 (4th Cir.2001)) (Claimant must show that absent error, the decision might have been different). An ALJ's error is harmless when it does not substantively prejudice the claimant. *See Mascio v. Colvin,* 780 F.3d 632, 639 (4th Cir.2015) (finding that an ALJ's error in assessing a claimant's credibility after, instead of before, determining his RFC would be harmless so long as the ALJ conducted a proper credibility assessment); *Tanner v. Comm'r of Soc. Sec.,* 602 F.App'x 95, 101 (4th Cir. 2015) (finding an ALJ's failure to weigh a medical source opinion was harmless error where "the RFC assessment and

[medical source's] opinion are largely consistent, and it is highly unlikely, given the medical evidence of record, that a remand to the agency would change the Commissioner's finding of non-disability"); *Austin v. Astrue,* No. 7:o6–CV–00622, 2007 WL 3070601, *6 (W.D.Va. Oct. 18, 2007) ("[E]rrors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error") (citing *Camp,* 22 F. App'x at 311). In this case, the ALJ's discussion of Dr. Capage's opinion and subsequent inclusion of his conclusions in the RFC finding verifies that the ALJ considered the opinion and gave it significant weight. Consequently, the undersigned **FINDS** that the ALJ's failure to expressly state the weight to Dr. Capage's opinion, and Dr. Marinelli's affirmation of Dr. Capage's opinion, was harmless error.

## B.  Vocational Experts' Testimony

Next, Claimant argues that the testimony of the two vocational experts was incomplete and unsupported because neither of them provided DOT job codes when identifying the other work that Claimant was capable of performing. Claimant relies on a decision from the Eastern District of Michigan in support of his position. (ECF No. 11 at 10-11). The Commissioner counters by contending that the Michigan decision is distinguishable from the instant action, because the primary thrust of decision was that an ALJ must insure that the testimony of a vocational expert is consistent with the DOT, or resolve any inconsistences; in this case, the ALJ fulfilled that duty. (ECF No. 12 at 16-18). The Commissioner asserts that when a vocational expert testifies that his or her opinions are consistent with the DOT, the ALJ is not required to do anything further to ensure consistency; such as, obtaining the relevant DOT occupation codes. According to the Commissioner, in the present case, the ALJ explicitly asked each vocational expert if

the opinions she expressed were consistent with the DOT. In both instances, the vocational expert answered in the affirmative. Claimant's counsel asked no follow-up questions; accordingly, the Commissioner posits that the testimony of the vocational experts was complete.

At the fifth step of the sequential evaluation, the burden to go forward with evidence shifts from the claimant to the agency. The ALJ must demonstrate that jobs exist in significant numbers in the economy that the claimant is capable of performing. When a claimant has both exertional and non-exertional impairments, the ALJ typically turns to a vocational expert to identify what, if any, occupations can be performed by a hypothetical claimant who possesses the same vocational factors and RFC as the claimant. *See* SSR 00-4p, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000). Social Security Ruling 00-4p provides guidance on how an ALJ should consider a vocational expert's testimony. The Ruling emphasizes that the SSA primarily relies upon the DOT "for information about the requirements of work in the national economy." *Id.*  For that reason, occupational evidence supplied by a vocational expert "generally should be consistent with the occupational information supplied by the DOT." *Id.* When there is a conflict between the testimony of a vocational expert and the DOT, the ALJ "must resolve the conflict by determining if the explanation given by the [vocational expert] is reasonable and provides a basis for relying on the [vocational expert's] testimony rather than on DOT information." *Id.* The ALJ has an affirmative duty to inquire regarding any conflicts between the vocational expert's testimony and the DOT and to explain in the written decision how conflicts were reconciled. *Id.,* at *4.  Because the ALJ may not rely on vocational opinions that conflict with regulatory policies or definitions, *id.* at *3, confirming the absence of conflicts, or expressly reconciling any identified conflicts, is

21

an important aspect of the ALJ's duties.

In this case, Claimant had two administrative hearings; at each hearing, a vocational expert provided testimony regarding occupations that Claimant could perform despite his limitations. (Tr. at 470-74, 484-88). Claimant is correct that while the experts identified specific jobs that Claimant was capable of doing, neither vocational expert provided the DOT codes for those job positions. Nonetheless, at both hearings, the ALJ specifically asked the vocational experts if their testimony was "consistent with the Dictionary of Occupational Titles and accompanying documentation[s]." (Tr. at 474, 489). In both instances, the vocational expert answered in the affirmative. (*Id.*).

Courts in this circuit have routinely held that an ALJ is only obligated to address apparent inconsistencies between a vocational expert's testimony and the DOT; in other words, the ALJ is not required to investigate and uncover discrepancies. *See Justin v. Massinari,* 20 F.App'x 158, 160 (4th Cir. 2001) (unpublished); *and Michel v. Com. of Soc. Sec.* Civil No. SAG–13–2311, 2014 WL 2565900, at *5 (D.Md. Jun. 5, 2014) (collecting cases). Neither SSR 00-4p, nor the applicable regulations, (20 C.F.R. §§ 416.966-416.969), mandate that a vocational expert provide job codes from the DOT as part of his or her testimony. *Haas v. Barnhart,* 91 F.App'x 942, 948 (5th Cir. 2004). Accordingly, "[b]ecause the lack of a DOT code does not, standing alone, signify [] a conflict," an ALJ meets her burden under Social Security rulings and regulations when she asks the vocational expert if his or her testimony is consistent with the DOT. *Reider v. Astrue,* 07 C 7271, 2008 WL 2745958, at *14 (N.D.Ill. July 11, 2008); *see also Ryan v. Astrue,* 650 F.Supp.2d 207, 218 (N.D.N.Y. 2009) (finding that an ALJ met his responsibilities under SSR 00-4p by making the necessary inquiry into the consistency

22

of the vocational expert's testimony with the DOT, and receiving an affirmative response; noting that "[t]here is no requirement that the [vocation expert] testify as to which DOT codes she relied upon."); *and Mosteller v. Astrue,* Civil Action No. 5:08–CV–003–RLV–DCK, 2010 WL 5317335, at *4 (W.D.N.C. Jul. 26, 2010) (holding that when an ALJ enquires into the consistency of the vocational expert's testimony with the DOT and receives a positive answer, there is no "apparent unresolved inconsistency" that must be addressed under SSR 00-4p).

Even the case cited by Claimant does not support his argument. *Teverbaugh v. Com. of Soc. Sec.,* 258 F.Supp.2d 702 (E.D.Mich. 2003). As the Commissioner points out, the ALJ in *Teverbaugh* failed to ask the vocational expert whether her testimony was consistent with the DOT and further failed to obtain job codes. As a result, the compatibility of the expert's opinions with the DOT could not be discerned. The District Court concluded that without confirmation of consistency and without job codes, "there is no apparent means of otherwise determining whether, in fact, the jobs identified are ones that Plaintiff can perform." *Id.* at 706. Clearly, the factual circumstances in *Teverbaugh* are inapposite to the circumstances in the instant action. Here, the vocational experts verified that their testimony was consistent with the DOT. Consequently, the undersigned **FINDS** Claimant's challenge on this ground to be without merit.

### C. Challenge to Credibility Analysis

Finally**,** Claimant contends that the ALJ erred in her credibility analysis by failing to consider all seven factors set forth in SSR 96-7P, and by ignoring Dr. Capage's opinions. (ECF No. 11 at 12-13). At the outset, the undersigned finds no merit in Claimant's allegation regarding Dr. Capage given that Claimant is plainly mistaken in

her assertion that the ALJ disregarded Dr. Capage's opinions. As explained above, the ALJ clearly considered Dr. Capage's opinions and incorporated his conclusion regarding Claimant's MRFC into the RFC finding.

With respect to Claimant's second contention, the purpose of SSR 96-7p is, in relevant part, to clarify when the disability evaluation "requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects" and "to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms." SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. Jul. 2, 1996). According to SSR 96-7p, the ALJ must use a two-step process. First, the ALJ must establish whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's alleged symptoms. *Id.* at *2.  Once the ALJ finds that the conditions can be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* Whenever the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by a claimant to support the alleged disabling effects based upon the entire case record. The Ruling sets forth the factors that the ALJ should consider in evaluating the claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. In performing this analysis, the ALJ must take into consideration "all the available evidence," including: the claimant's subjective complaints; claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues,

redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities; specific descriptions of the pain; the location, duration, frequency and intensity of symptoms; precipitating and aggravating factors; any medical treatment taken to alleviate it; and any other factors relating to functional limitations and restrictions.[2] *Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996). In *Hines v. Barnett*, the Fourth Circuit Court of Appeals stated,

> [a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d 559, 565 n.3 (4th Cir. 2006) (citing *Craig*, 76 F.3d at 595)). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ.

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessment for that of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusion. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence ... or substitute its own judgment for that of the Commissioner." *Hays,* 907 F.2d. at 1456.  Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler,* 739 F.2d 987, 989-990 (4th Cir. 1984) (citing *Tyler v.*

---

[2] *See* 20 C.F.R. §§ 416.929(c)(3).

*Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976)).

In this case, the undersigned **FINDS** that the ALJ's credibility assessment of Claimant was consistent with the applicable regulation, case law, and Social Security Rulings. 20 C.F.R. § 416.929; SSR 96-7p; *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). The ALJ carefully considered Claimant's subjective complaints *and* the objective medical record in reaching a conclusion regarding Claimant's credibility. Substantial evidence exists in the record that Claimant's statements do not correlate with the objective medical evidence, or with his own description of his activities.

At the outset of the two-step process, the ALJ summarized Claimant's subjective statements and his description of his daily, weekly, and monthly activities. The ALJ acknowledged Claimant's history of an ankle fracture surgery and knee replacement, discussing Claimant's reports of the intensity, persistence, and location of pain he has suffered since those procedures, and the disabling effects of the underlying injuries. (Tr. at 95). The ALJ outlined Claimant's activities and his educational background, noting that Claimant had failed the GED examination five or six times. Notwithstanding these impairments, Claimant stated he was able to count change, take care of his personal needs, babysit his grandson, wash dishes, do yard work, play dominos and socialize with his neighbor, and go shopping. (Tr. at 96). Based on Claimant's statements and medical history, the ALJ accepted that Claimant's medically determinable impairments could reasonably be expected to produce the symptoms he described. (Tr. at 96). However, the ALJ did not find Claimant to be entirely credible to the extent that he claimed his symptoms were disabling. (Tr. at 29–30).

The ALJ explained that although Claimant alleged disability due to his 2001 ankle fracture, the evidence confirmed that he worked after undergoing surgery to

repair the fracture. As proof, the ALJ pointed to an emergency department record completed in May 2002 that documented an injury to Claimant's knee, which occurred when he was working with a chainsaw. The ALJ also took into account Claimant's habit of drinking a pint of whiskey every day and smoking marijuana whenever he could get it. (Tr. at 96). Additionally, the ALJ discussed the medical source opinions. She mentioned a physical RFC assessment prepare by Dr. Fulvio Franyutti in which he found Claimant capable of light work with some exertional and non-exertional restrictions to account for Claimant's previous ankle and knee injuries. She also mentioned the examination performed by Dr. Apgar. The ALJ noted that although Dr. Apgar felt that Claimant suffered from chronic pain, he did not believe the pain caused significant work-related limitations. (*Id.*). The ALJ highlighted observations recorded by Dr. Apgar during his examination of Claimant that called into question some of Claimant's statements. For instance, Dr. Apgar noted that Claimant was able to get on and off the examination table without difficulty; move around the room easily; dress and undress without assistance; and walk with a steady, deliberate, and weight-bearing gait, without the use of an assistive device. Ultimately, Dr. Apgar found that Claimant should have no difficulty with any basic job function.

The ALJ then discussed Claimant's mental impairment. She determined that Claimant was functioning at a borderline intellectual level after taking into consideration Claimant's test results, school records, and his decreased cognitive functioning caused by daily substance abuse. She reviewed the findings of Dr. Frederick and Ms. Tate and explicitly considered the summary provided by Dr. Capage in which he opined that Claimant could work with certain specific limitations related to his intellectual and social functioning. (Tr. at 97). Lastly, the ALJ analyzed Dr. Gitlow's

opinions, recognizing that he was a specialist in addiction and forensic psychiatry. She acknowledged Dr. Gitlow's comment that while Claimant appeared to be functioning at a borderline intellectual level, there was no evidence that his intellectual deficits were profound enough to cause severe limitations in his ability to work. (*Id.*).

Accordingly, the ALJ considered the factors set forth in SSR 96-7p. She clearly assessed Claimant's activities; his statements regarding the location, frequency and duration of pain; factors that aggravated his symptoms, including sitting, standing, and walking; factors that helped his symptoms, including drinking whiskey and smoking marijuana; the treatment he received; the consistency of Claimant's testimony regarding his limitations as compared to statements attributed to him in the medical records; Claimant's self-reported activities; the objective findings and observations; and other relevant factors like the expert opinions.

Claimant is correct that the ALJ did not comment on each factor in her written decision; nevertheless, that failure does not constitute error. While SSR 96-7p obliges the ALJ to consider these factors, the Ruling does not expect or mandate the ALJ to provide a detailed written analysis of each factor. *See Smith v. Colvin,* No. 1:14-cv-01147-JMS-DKL, 2015 WL 2338741, at *8 (S.D. Ind. May 15, 2015) (holding that "[t]he ALJ is not required to address every factor [in SSR 96-7p] or every piece of evidence in his decision, but must support his credibility determination with substantial evidence"); *Carr v. Colvin,* No. CA 13–00273–C, 2014 WL 5093086, at *16 (S.D.Ala. Oct. 10, 2014) (stating that "under the law of the Eleventh Circuit, the ALJ was not required to explicitly discuss the seven factors" set forth in SSR 96-7p); *Ellison v. Com. of Soc. Sec.,* No. 5:12 CV 1941, 2013 WL 4050964, at *9 (N.D.Ohio Aug. 9, 2010) (holding that the factors in SSR 96-7p "are factors an ALJ is required to *consider* when determining

Plaintiff's credibility, not explicitly address"); *Jacinto v. Com. of Soc. Sec.,* No. 1:12–cv–01394–SAB, 2013 WL 4041865, at *5 (E.D.Cal. Aug. 8, 2013) ("SSR 96-7p describes seven factors that the A LJ must consider when assessing the credibility of an individual's statements regarding pain or other symptoms. However, SSR 96-7p does not require the ALJ to expressly discuss each factor in its written decision. Accordingly, the failure to expressly discuss all seven factors does not constitute a reversible error."); *and Smith v. Astrue,* No. 4:09–cv–00767 JWC, 2011 WL 1119746, at *7 (E.D.Ark. Mar. 25, 2011) ("[A]n ALJ need only acknowledge and consider these factors [in SSR 96-7p], and need not explicitly discuss each one.")

Having reviewed the record and the ALJ's determination, the undersigned **FINDS** that the ALJ did not err in her assessment of the credibility of Claimant's statements regarding the persistence, intensity, and severity of his symptoms. To the contrary, the undersigned **FINDS** that the ALJ's conclusion that Claimant's statements were less than fully credible is supported by substantial evidence. Claimant's physical examination by Dr. Apgar reflected minimal functional limitations. (Tr. at 306-23). Although he complained of chronic pain, Claimant was taking no medication at the time of the examination. (Tr. at 307). He had no apparent difficulties with movement, ambulation, or posture. (Tr. at 310). His upper and lower extremity joints appeared normal, without redness, effusion, swelling, thickening, or instability. (Tr. at 313-14). Claimant's manipulation, pinch, and grasp were intact. His gait was weight-bearing, steady, and deliberate, without the use of an assistive device. (Tr. at 314). He had no spinal spasms and a normal spinal lordotic and kyphotic curve. (Tr. at 315). Claimant's neurological examination was entirely normal. He was able to perform heel walking, toe walking, and could squat and rise. (Tr. at 316). Other than mild restriction seen in the

flexion of the hips bilaterally, Claimant had no significant compromise on range of motion testing. (Tr. at 317). The absence of remarkable physical findings was substantiated at a second physical examination of Claimant performed by Dr. Kip Beard, with one exception. Dr. Beard believed that Claimant needed eyeglasses to correct his nearsightedness. (Tr. at 331-35).

Similarly, Claimant's psychological evaluations reflected no major psychiatric disorders, apart from him alcohol dependence and cannabis abuse. (Tr. at 305, 329). Claimant was diagnosed with borderline intellectual functioning, but part of that diagnosis was attributed to his lack of education, (Tr. at 318), and part was thought to be a consequence of his longstanding substance use and abuse. (Tr. at 301, 451). Claimant had not and did not receive any psychiatric counseling and treatment, and he took no psychotropic medications.

Moreover, Claimant's activities do not reflect disabling symptoms. Claimant socialized daily with his neighbors, talking on the porch and playing dominos. (Tr. at 329). He performed household chores, such as taking out the trash, cooking several nights per week, washing dishes, moping, shopping, washing the siding on his house, mowing the grass with a push mower, and running a weed eater. (*Id.*). He drove to a friend's house in Ohio twice each month to visit, and he attended to his daily needs without assistance. (*Id.*). Claimant had no difficulty answering questions at the administrative hearings. Although Claimant alleges that he meets the definition of mild mental retardation, that diagnosis was not confirmed by any of the examiners. Claimant produced school records that showed average to below average grades and some failing grades; however, the records do not, on their face, corroborate Claimant's allegation that he was in special education. Furthermore, the school records are void of any explanation

for some significant discrepancies in Claimant's performance over the years. For example, in the seventh grade, Claimant received one B, three D's, and two F's. (Tr. at 199). However, the following year in eighth grade, Claimant received three A's, two B's, and one C. (*Id.*). In tenth grade, Claimant received an A, two B's, one C, three D's, and one F. (Tr. at 211). While it is true that Claimant's A grade was in physical education, he received a B grade in career math, which is a grade that arguably contradicts a diagnosis of mental retardation. Considering that none of the classes on any of Claimant's report cards was designated as a special education course, Claimant's grades do not present reliable evidence of a disabling intellectual impairment. Therefore, Claimant's challenge to the ALJ's credibility analysis is unpersuasive.

## VIII.  **Recommendations for Disposition**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleading, (ECF No. 11), **AFFIRM** the decision of the Commissioner (ECF No. 12), **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of

31

such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  July 29, 2015

Cheryl A. Eifert
United States Magistrate Judge

32